## <u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT</u>

I, Tyler Field, being duly sworn, state the following:

### <u>Introduction</u>

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am also an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I have been employed as a Special Agent (SA) with the Drug Enforcement Administration (DEA) since March 2016.  I am currently assigned to the Providence District Office. I have been previously assigned to the Boston Division Office and to the Cincinnati District Office.  I also served as a U.S. Army Military Police Major in the Indiana Army National Guard for more than twenty years.  Prior to joining the DEA, I was a police officer for the town of Bridgewater, Massachusetts for more than three years.  I graduated from the U.S. Army Military Police School, Plymouth Police Academy, and DEA Basic Agent Academy.  I hold a Bachelor of Science in Accounting from the University of Massachusetts, Dartmouth.

3. As a DEA Special Agent, I am authorized to investigate violations of federal narcotics laws in Title 21 of the United States Code.   I have received significant training in the field of narcotic investigations and enforcement. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by people engaged in the trafficking of illegal drugs.

4.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I have also reviewed recorded conversations and telephone, financial, and drug records.  Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

5.      I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, communication apps, and other means to facilitate their illegal activities.

6.      Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and that drug traffickers often coordinate such transportation through the use of cellular telephones. Through my training and experience, I have acquired specialized knowledge in the activities of drug traffickers, including their use of residences, businesses, and drug "stash houses," to store and process drugs for distribution and to direct their drug distribution activities. That training and experience has led me to believe that drug traffickers store contraband, as well as other evidence of their crimes such as drug proceeds, cellular telephones, cuff sheets or owe sheets, at their residences, businesses, and stash houses.

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set

forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

8.       Since at least as early as March 2022 Providence DEA has been investigating

Jonathan Ivan BADILLO-HERNANDEZ with date of birth xx/xx/1989 for violations of 21

U.S.C. § 841 (possession with intent to distribute controlled substances) and 21 U.S.C. § 846

(conspiracy to possess with intent to distribute controlled substances).

9.       I submit this affidavit in support of:

     a.   An application for a criminal complaint charging Jonathan Ivan

          BADILLO-HERNANDEZ with a violation of 21 U.S.C. § 841(a)(1) and

          (b)(1)(A)(vi) (possession with intent to distribute 400 grams or more of

          fentanyl) (the "Target Offense"); and

     b.   An application for a search warrant to search 20 Pleasant Street,

          Apartment 1, Lawrence, MA 01841 (the "Target Location"). The Target

          Location is more specifically described in Attachment A, which I

          incorporate by reference.

10.     Based on the facts set forth in this affidavit, there is probable cause to believe that

BADILLO-HERNANDEZ has committed the Target Offense and that evidence of the

commission of the Target Offense will be located at the Target Location.

11.     I am a Special Agent and have conducted this investigation working closely with

other DEA Special Agents and law enforcement personnel. Accordingly, I am familiar with the

facts concerning this investigation. The facts in this affidavit come from my personal

observations, my training and experience, and information obtained from other agents and

cooperating source(s). This affidavit is intended to show that there is probable cause for the

complaint and search warrant and does not set forth all of my knowledge about this matter.

**<u>PROBABLE CAUSE</u>**

12.    On March 22, 2022, a cooperating source (the "CS")[1] communicated via telephone

and text message, at the direction of Providence DEA agents, with an unknown male later

identified as Jonathan Ivan BADILLO-HERNANDEZ who was using telephone number 929-

426-8184.  Providence DEA agents learned of the phone number from California DEA agents

working with a confidential source in California (the "California CS").[2]  According to the

California CS, the user of the -8184 number has at least 10 kilograms of narcotics and 80,000-

100,000 pills at a stash house.

13.    The communications between the CS and BADILLO-HERNANDEZ occurred in

Spanish; following each communication, controlling agents spoke with the CS to learn what was

discussed. The CS and BADILLO-HERNANDEZ discussed a potential narcotics transaction.

The two agreed to meet the following day (March 23, 2022) so that the two could coordinate a

future purchase of a kilogram of fentanyl for an unspecified price. BADILLO-HERNANDEZ

asked the CS to come to 12 Pleasant Street, Lawrence, Massachusetts, for the meet-up.  12

Pleasant Street is approximately 150 feet away from the Target Location of 20 Pleasant Street.

---

[1] The CS has provided reliable information in several ongoing drug investigations that has
resulted in the seizure of drugs and drug proceeds, and has made controlled buys for
investigators. The CS has been convicted of prior drug offenses. The DEA compensates the CS
for working as a CS. Investigators believe the CS to be reliable.

[2] The California CS has past drug and gun charges.  He is paid by the DEA for his cooperation.
DEA has been able to independently corroborate information provided by the California CS and
believes the CS to be reliable.

14.    On March 23, 2022, agents travelled to the Lawrence area and drove past 12 Pleasant Street. Agents saw several vehicles parked in the area of 12 Pleasant Street, including a red Nissan XTERRA with Massachusetts license plate 2NVV18 (the "Nissan"). The Nissan was parked on the street directly across from 12 Pleasant Street. According to information obtained from the Registry of Motor Vehicles, Massachusetts registration 2NVV18 belongs to Jonathan Ivan BADILLO-HERNANDEZ of 20 Pleasant Street, Apartment 1, Lawrence, MA 01841 (the Target Location).

15.    Controlling agents directed the CS to travel to the Lawrence area. Upon arrival, controlling agents searched the CS and the CS's vehicle without finding any drugs, money, weapons, or other contraband. Controlling agents installed audio- and video-recording equipment in the CS's vehicle. Controlling agents directed the CS to communicate with BADILLO-HERNANDEZ at telephone number 929-426-8184 and direct BADILLO-HERNANDEZ to meet with the CS at a public parking lot located near 126 Merrimack Street in Methuen (nearly two miles from the Target Location). In a series of recorded and monitored telephone calls and text messages, the CS and BADILLO-HERNANDEZ discussed the meeting location. BADILLO-HERNANDEZ instructed the CS to meet near a 7/11 Convenience Store but the CS insisted on meeting near 126 Merrimack Street. BADILLO-HERNANDEZ agreed to meet in the parking lot near 126 Merrimack Street and also told the CS that BADILLO-HERNANDEZ would be driving a red SUV.

16.    At approximately 6:34 p.m., agents observed the Nissan pulled into the 7/11 Convenience Store parking lot located at 119 Merrimack Street, directly across the street from the agreed meet location. The CS directed BADILLO-HERNANDEZ to come across the street and the Nissan drove into the parking lot where the CS was parked. BADILLO-HERNANDEZ

exited the driver's-side door of the Nissan and entered the front passenger seat of the CS's

vehicle. All communications that occurred inside the CS's vehicle were video- and audio-

recorded and were monitored by controlling agents.

17.    While inside the CS's vehicle, BADILLO-HERNANDEZ and CS talked to each

other in Spanish. BADILLO-HERNANDEZ gave the CS a plastic bag containing a white

powdery substance. BADILLO-HERNANDEZ then exited the CS's vehicle and entered the

driver's-side door of the Nissan. Agents observed that BADILLO-HERNANDEZ appeared to be

the only occupant of the Nissan. The Nissan remained parked for approximately three minutes

and then departed the parking lot and was followed by surveillance. After the Nissan departed

the area, agents met with the CS. The CS gave agents the plastic bag containing the white

powdery substance. Agents collected the audio- and video-recording equipment and again

searched the CS and the CS's vehicle without finding any drugs, money, weapons, or other

contraband. The CS said that during their meeting, BADILLO-HERNANDEZ delivered a

sample of fentanyl and told the CS that BADILLO-HERNANDEZ would be willing to deliver a

kilogram of fentanyl to the Providence, RI area the following day (March 24, 2022).  The CS

said that BADILLO-HERNANDEZ did not discuss a price for the kilogram of fentanyl. The CS

also said that BADILLO-HERNANDEZ offered to sell the CS marijuana and/or an unspecified

type of pills. Agents later transported the white powdery substance to the DEA Providence

District Office and conducted a field test. The field test yielded a positive result indicating the

substance was fentanyl.

18.    Following the departure of the Nissan from the meet location, agents saw the

Nissan make a series of stops. During the first stop, agents saw the Nissan on the street near the

area of 4 Broadway Street in Methuen.   Agents did not see where BADILLO-HERNANDEZ

went once he exited the Nissan. During the second stop, agents saw BADILLO-HERNANDEZ enter a store.

19.    At approximately 7:33 p.m., agents saw BADILLO-HERNANDEZ exit the store and enter the driver's door of the Nissan. Agents maintained surveillance on the Nissan as it travelled directly back to Pleasant Street in Lawrence, arriving at approximately 7:37 p.m. Agents saw the Nissan park on the street directly in front of 12 Pleasant Street. BADILLO-HERNANDEZ exited the driver's-side door of the Nissan and then walked east on Pleasant Street, away from 12 Pleasant Street and down the driveway of the Target Location. Due to the night-time hour agents did not see where BADILLO-HERNANDEZ went but determined that he did not enter 12 Pleasant Street. At this point, surveillance was terminated.

20.    On March 24, 2022 the CS and BADILLO-HERNANDEZ communicated via text message with BADILLO-HERNANDEZ using telephone number 929-426-8184. These communications were recorded and monitored. Following these communications, the CS told controlling agents what was discussed. The CS said that BADILLO-HERNANDEZ agreed to meet with the CS later that day to distribute two kilograms of fentanyl.

21.    At approximately 5:34 p.m., agents saw the Nissan park on Pleasant Street and saw BADILLO-HERNANDEZ walk toward the back of the Target Location and out of view.  At approximately 5:47 p.m. agents saw BADILLO-HERNANDEZ exit the rear door of the Target Location carrying a backpack and walk around to the front of the Target Location. BADILLO-HERNANDEZ entered the Nissan and remained parked on Pleasant Street. While parked, BADILLO-HERNANDEZ communicated with the CS.  The CS asked BADILLO-HERNANDEZ to meet him at the Wrentham Premium Outlets in order to obtain the drugs.

22.     At approximately 5:55 pm, agents saw the Nissan leave Pleasant Street and travel to the area of 324 Prospect Street, Lawrence, MA. BADILLO-HERNANDEZ exited the Nissan and walked out of view.

23.     At approximately 6:12 pm, agents saw BADILLO-HERNANDEZ enter the driver's-side door of the Nissan carrying a black shopping bag. He remained parked inside the Nissan until approximately 6:22 pm. The Nissan then departed the area and agents followed the car back to the Target Location. BADILLO-HERNANDEZ walked around to the rear of the Target Location with nothing in his hands.

24.     At approximately 6:33 pm agents saw BADILLO-HERNANDEZ exit the rear door of the Target Location carrying a large blue bag. BADILLO-HERNANDEZ walked toward the front of the Target Location and entered the Nissan. Around this time, BADILLO-HERNANDEZ communicated to the CS that he would be arriving in a gray Honda Accord and was on his way.

25.     The Nissan departed the area and agents followed as it travelled directly to the area of Center and Broadway. BADILLO-HERNANDEZ exited the Nissan and entered a store. Approximately 5 minutes later BADILLO-HERNANDEZ exited the store and got into the driver's-side door of the Nissan. BADILLO-HERNANDEZ did not appear to be carrying anything. Agents then followed the Nissan to the area of Exchange Street near Park Street in Lawrence, MA. The Nissan parked on the street and BADILLO-HERNANDEZ exited. BADILLO-HERNANDEZ walked away out of view.

26.     At approximately 8:32 pm BADILLO-HERNANDEZ texted the CS indicating that BADILLO-HERNANDEZ had arrived in Wrentham. At approximately 8:34 pm, a gray Honda CRV and MA registration 1YKX12 (the "Honda") arrived at the Wrentham Outlets with

three occupants. According to information from the Registry of Motor Vehicles, the Honda is registered to William Garcia LOYA 51 Exchange Street, Lawrence, MA. 51 Exchange Street is located at the intersection of Exchange and Park, which is where agents last saw BADILLO-HERNANDEZ. The Honda pulled into the parking lot of the Wrentham Outlet and parked in a parking spot.

27.     At approximately 9:42 p.m., an officer from the Massachusetts State Police initiated a traffic stop of the Honda on Interstate 495-North in Westford.  BADILLO HERNANDEZ was sitting in the passenger's seat of the Honda.  An individual named Mario Ramirez VEGA was driving the car.  The registered owner of the Honda, LOYA, was sitting in the back seat.  On the back seat near LOYA was the same blue bag that BADILLO-HERNANDEZ carried out of the rear of the Target Location.  Inside the blue bag investigators found some laundry and, at the bottom, an ammunition container.  Inside the ammunition container was a brick of suspected fentanyl wrapped in electrical tape.

28.     While interviewing BADILLO-HERNANDEZ investigators obtained a chain of four keys that they believe includes the keys to the Target Location.

## Summary of Probable Cause

29.     In sum, on March 23, 2022, BADILLO-HERNANDEZ emerged from a car registered to him at 20 Pleasant Street in Lawrence, the Target Location, to provide the CS a sample that field-tested positive for fentanyl.  BADILLO-HERNANDEZ then returned to the driveway of the Target Location.

30.     On March 24, 2022, BADILLO-HERNANDEZ emerged from the rear door of the target location with a  large blue bag while arranging to distribute kilograms of fentanyl to the CS.  CS then told BADILLO-HERNANDEZ to meet him at Wrentham Outlets, and BADILLO-

HERNANDEZ said that he would be in a grey Honda CRV.  When investigators pulled over the

Honda, BADILLO-HERNANDEZ was inside and the blue bag he took from the Target Location

was inside the car and contained a kilogram of suspected fentanyl.  According to information

California DEA investigators have developed, BADILLO-HERNANDEZ may have another 9

kilograms of fentanyl at the Target Location.

**Drug Trafficker's Use of Residences, Cell Phones, and Computers Generally**

31.    Based on my training and experience, and the collective experience of other

investigators participating in this investigation, I know that traffickers of controlled substances

frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug

business.  I also know that traffickers of controlled substances usually keep, in addition to drugs,

paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing

controlled substances, including scales, plastic bags, cutting agents, and utensils at their

residences or stash locations.  Based upon my training and experience, as well as the training and

experience of other law enforcement agents I have worked with, I am aware that it is generally a

common practice for drug traffickers to store drug-related paraphernalia in their residences for

longer periods of time than they keep drugs in their residences.

32.    Based upon my experience and the experience of other law enforcement

officers who have participated in the execution of numerous search warrants at the residences of

drug-traffickers, it is generally a common practice for drug traffickers to maintain in their

residences records relating to their drug trafficking activities.  Because drug traffickers in many

instances will "front" (that is, sell on consignment) controlled substances to their clients, or

alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is

necessary to keep track of amounts paid and owed, and such records are often kept close at hand

so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe"

records to show balances due for drugs sold in the past ("pay") and for payments expected

("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers

often maintain telephone and address listings of clients and suppliers and keep them immediately

available in order to efficiently conduct their drug trafficking business.  I am also aware that drug

traffickers often maintain such documents related to their drug trafficking activities at their

residences for an extended period of time, regardless of whether they are physically in

possession of drugs on the premises.

33.        Even when drug dealers store their drugs outside their residences, I know

that they often will keep records relating to these offsite storage locations at their primary

residences.  Such documents include rental or storage property agreements and receipts.

34.        Based upon my training and experience, as well as the training and

experience of other law enforcement agents I have worked with, I am also aware that it is

generally a common practice for drug traffickers to conceal at their residences either the

proceeds from drug sales or monies to be used to purchase controlled substances.  Drug

traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for

controlled substances, and evidence of such financial transactions and records relating to income

and expenditures of money and wealth in connection with drug trafficking are often kept in their

residences.  Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics

sold or bought by the drug dealers.

35.        Moreover, drug traffickers commonly possess and use multiple cellular

telephones simultaneously to conduct their drug trafficking activities, and many of these cellular

telephones are kept at their residences.  It is common for these cellular telephones to be retained,

although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

36.       When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

37.       Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

38.       It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as

internet searching or emailing, in addition to calling and text messaging, can now be performed

from many cell phones.  In addition, those involved in drug trafficking crimes commonly

communicate using multiple cellular telephones.  Contemporaneous possession of multiple

cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers

of and the particular numbers dialed by particular cellular telephones can be evidence of drug

trafficking.

       39.        As with most electronic/digital technology items, communications made

from an electronic device, such as a computer or a cell phone, are often saved or stored on the

device.  Storing this information can be intentional, for example, by saving an e-mail as a file on

a computer or saving the location of one's favorite websites in "bookmarked" files.  Digital

information can also be retained unintentionally.   Traces of the path of an electronic

communication or of an internet search may be automatically stored in many places on a

computer or a cell phone.  In addition to electronic communications, a user's Internet activities

generally leave traces in the web cache and Internet history files.  A forensic examiner often can

recover evidence that shows when and in what manner a user of an electronic device, such as a

computer or a cell phone, used such a device.

       40.        Electronic files or remnants of such files can be recovered months or even

years after they have been downloaded, deleted, or viewed via the Internet.  Electronic files

downloaded to a hard drive can be stored for years at little or no cost. Even when such files have

been deleted, they often can be recovered months or years later using readily available forensic

tools.  When a person "deletes" a file on an electronic storage device such as a computer, the

data contained in the file often does not actually disappear; rather, that data often remains on the

device until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files,

may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

41.     I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the target of this investigation.  In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

  a.  controlled substances, such as fentanyl;

  b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

  c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary

transactions involving the proceeds from the sale of controlled substances;

d.   personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.   cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.   documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.   cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing

illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.   firearms and other dangerous weapons; and,

i.   identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

42.   Based on all of the evidence I have obtained in the course of this investigation, and for the reasons set forth above, I believe BADILLO-HERNANDEZ, like many drug traffickers, uses his residence and/or stash locations in furtherance of his ongoing drug-trafficking activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachments B, will be found in the Target Location.  *See e.g., United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[3]

_____

[3] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after

## CONCLUSION

43.          I believe the facts contained within this affidavit support probable cause to believe that BADILLO-HERNANDEZ possessed with intent to distribute 400 grams or more of fentanyl.    Based on my training, experience, discussions with other law enforcement officers/agents, and the information contained herein, I believe that probable cause exists that the items listed in Attachment B will be found at the Target Location further described and identified in Attachment A and that these will constitute evidence of the Target Offenses.

_Tyler Field_     DLC
Tyler D. Field
Special Agent
Drug Enforcement Administration

Sworn to by telephone in accordance with Fed. R. Crim. P. 4.1 this 24ᵗʰ day of March, 2022.

_____
Hon. Donald L. Cabell
United States Magistrate Judge

evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information relating to marijuana operation not stale)). As the First Circuit has explained, "[b]y it's very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

**ATTACHMENT A**
<u>Description of the Premises to be Searched</u>

20 Pleasant Street, Apartment 1, Lawrence, MA (hereinafter the "Target Location"). The Target Location is described as a two-story structure containing two units. The numbers "18" and "20" appear in black on the front door. Entry is through the rear entrance of the building. After passing through the rear entrance, Apartment 1 is accessed through the white door immediately on the left (a staircase is to the right; investigators will not ascend the staircase). There is a driveway located southwest of the structure and a chain link fence to along the east and west of the property. The front of the Target Location is pictured below:



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a) & 846, including:

      A.      Controlled substances, including but not limited to fentanyl.

      B.      Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances, including records of sales, records of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

      C.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

      D.      Documents or tangible evidence reflecting dominion, ownership, and/or

control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

E.    Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

F.    For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

1.    evidence of who used, owned, or controlled the computer equipment;

2.    evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

3.    evidence of the attachment of other computer hardware or storage media;

4.    evidence of counter-forensic programs and associated data that are designed to eliminate data;

5.    evidence of when the computer equipment was used;

6.    passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7.      records and tangible objects pertaining to accounts held with

companies providing Internet access or remote storage; and

G.     Records and tangible objects relating to the ownership, occupancy, or use

of the premises to be searched (such as utility bills, phone bills, rent

payments, mortgage payments, photographs, insurance documentation,

receipts and check registers).

H.     Cellular telephones belonging to or used by Jonathan Ivan BADILLO-

HERNANDEZ, and all names, words, telephone numbers, email

addresses, time/date information, messages or other electronic data

relating to or referencing drug trafficking and/or referencing individuals

engaged in drug trafficking, located in the memory of any mobile

telephone, including but not limited to:

a.      Names and contact information that have been programmed into

the device(s) (including but not limited to contacts lists) of individuals

who may be engaged in drug trafficking;

b.      Logs of calls (including last numbers dialed, last calls received,

time of calls, missed calls, and duration of calls) both to and from the

device(s);

c.      Text messages both sent to and received from the device(s)

(including any in draft form) relating to or referencing drug trafficking

and/or referencing individuals engaged in drug trafficking;

d.      Incoming and outgoing voice mail messages both to and from the

device(s) relating to or referencing drug trafficking or individuals engaged

in drug trafficking;

e.       GPS data;

f.       Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g.       Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.       All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.       Service provider handset unlock password(s) and any other passwords used to access the electronic data described above.

II.    All computer hardware, computer software, and storage media.  Off-site searching of these items shall be limited to searching for the items described in paragraph I.

## DEFINITIONS

For the purpose of this warrant:

A.      "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.      "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such

22

as a keyboard, printer, scanner, monitor, and drive intended for removable

storage media); any related communication device (such as a router,

wireless card, modem, cable, and any connections), and any security

device, (such as electronic data security hardware and physical locks and

keys).

C.      "Computer software" means any program, program code, information or

data stored in any form (such as an operating system, application, utility,

communication and data security software; a log, history or backup file; an

encryption code; a user name; or a password), whether stored deliberately,

inadvertently, or automatically.

D.      "Storage media" means any media capable of collecting, storing,

retrieving, or transmitting data (such as a hard drive, CD, DVD, or

memory card).

E.      "Data" means all information stored on storage media of any form in any

storage format and for any purpose.

F.      "A record" is any communication, representation, information or data.  A

"record" may be comprised of letters, numbers, pictures, sounds or

symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government

will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer

equipment, the government determines that some or all of this equipment does not contain

contraband or the passwords, account information, or personally-identifying information of

victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.